RON BENDER (SBN 143364)
LINDSEY L. SMITH (SBN 265401)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email:  rb@lnbyb.com, lls@lnbyb.com

Attorneys for Chapter 11 Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>WEST COAST DISTRIBUTION, INC.,<br><br>      Debtor and Debtor in Possession. | Case No.: 2:19-bk-20332-BB<br>Chapter 11 Case<br><br>**DECLARATION OF KHALID LEMLIH IN SUPPORT OF DEBTOR'S MOTION FOR AN ORDER: (1) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES; (2) APPROVING OF THE DEBTOR'S ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS AND APPROVING OF THE DEBTOR'S REJECTION OF THOSE UNEXPIRED LEASES AND EXECUTORY CONTRACTS WHICH ARE NOT ASSUMED AND ASSIGNED; (3) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d); AND (4) GRANTING RELATED RELIEF**<br><br>Hearing Date, Time and Location:<br>Date:  November 20, 2019<br>Time:  11:00 a.m.<br>Place:  Courtroom 1539<br>        255 E. Temple Street<br>        Los Angeles, CA  90012 |

## DECLARATION OF KHALID LEMLIH

I, Khalid Lemlih, hereby declare as follows:

1.      I am over 18 years of age. I am the Vice President of Operations of West Coast Distribution, Inc. (the "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case, a position I have held for the past approximately 15 years since the inception of the Debtor.  I am the person in charge of the Debtor's day-to-day business operations.  I am the primary person at the Debtor who interfaces with current and prospective customers, and with suppliers, employee staffing companies and creditors.  I am therefore very familiar with the business operations of the Debtor.  I do not have any ownership interest in the Debtor.  I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.      I am familiar with the history, organization, operations and general financial condition of the Debtor.  I make this Declaration in support of the Debtor's sale motion filed on October 30, 2019 as Docket Number 115 (the "Sale Motion").

3.      On August 30, 2019, the Debtor commenced this bankruptcy case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtor has operated its business and managed its affairs as a debtor in possession.

4.      Since 2005, the Debtor has been providing premier technology driven supply chain management, logistics warehousing, fulfillment and 3PL distributions services to clients in the apparel, retail, and lifestyle industries.   The Debtor has worked with a wide range of established and rapidly growing brands.  On behalf of those brands, the Debtor ships the brands' inventory daily to retailers, such as Walmart, Target, JCPenney, Kohl's, Neiman Marcus, Macy's, Bloomingdale's, and Saks Fifth Avenue.

5.      The Debtor operates out of three huge leased warehouses located at (1) 2760 Fruitland Avenue, Vernon, California 90058 (120,000 sf); (2) 2602 E. 37th Street Vernon, CA 90059 (171,000 sf); and (3) 12828 Carmenita Road, Santa Fe Springs, CA 90670 (268,000 sf). The three warehouses are located within 10 miles of one another, which allows the Debtor to reallocate employees to the particular warehouse that needs the labor at a moment's notice. The ability to staff each warehouse based upon the need on a particular day allows the Debtor to be extremely efficient and competitive within its industry.  The total monthly rent for these three warehouse locations (one of which includes the Debtor's business office) is approximately $416,832.

6.      The Debtor enters into agreements with its customers based upon each customer's needs. The services available to each customer include, but are not limited to, storing of inventory, fulfillment (shipping to various retailers as needed), and processing returns from retailers.

7.      The Debtor uses information technology in connection with its warehouse management system to streamline the process of automating, integrating, and tracking all activities performed within its facilities. The performed activities include services, such as receiving, put away, picking & packing, and shipping. The utilization of the system brings great efficiency and accuracy, which translates into better services and cost savings for the Debtor's clients.

8.      Each year through the Debtor's product fulfillment center and finishing facilities, the Debtor handles over 90 million garment units and 45 million flat folds for major brands, totaling over $1 billion worth of merchandise annually.  With this level of volume being handled by the Debtor through three locations comprising nearly 560,000 square feet, the Debtor's business operations are substantial.

9.    The benefits of the Debtor's information technology in warehousing for its customers include: having visibility into inventory, orders, customized reports, invoices, and other data; having access to real-time information throughout each phase of the logistics process; enjoying reduced costs, stemming from optimized efficiencies; and having an overall competitive advantage in the marketplace due to an optimized supply chain. In other words, the Debtor's warehouse management system is helping the Debtor's customers control inventory, view and manage all warehousing processes in real time, and reduce their overall logistics expenses, as they improve their own efficiency through the visibility that the Debtor provides.

10.    The Debtor's principal assets consist of its cash on hand, its accounts receivable, its agreements with its customers (described more below), the security deposits held by the Debtor's landlords and the Debtor's leasehold interests held in connection with the leases of the warehouses out of which the Debtor operates.  A detailed description of the Debtor's assets, including the assets proposed to be sold (defined as the "Purchased Assets") is set forth below.

11.    The Debtor's primary pre-petition liabilities consist of the approximately $1,044,270.37 of secured debt owed to the Debtor's principal, Jilal El Basri, and substantial amounts owed to the Debtor's pre-petition staffing agencies, which supply (or supplied) most of the Debtor's employees. As discussed in more detail below, the overwhelming largest unsecured creditor is Workforce, which, as explained below, obtained a pre-petition judgment against the Debtor in the amount of $4,255,370.44.  As explained below, the Debtor also has a substantial amount of outstanding post-petition liabilities, the largest of which pertain to post-bankruptcy credit provided to the Debtor by various staffing agencies.

12.    In 2015, the Debtor decided to expand its operations and customer base. However, in doing so it grew too rapidly and the result was that although the Debtor's quantity

increased, its quality in services rapidly declined. Originally, the Debtor believed that in expanding its business, even if it affected the Debtor's quality of services, the expansion would pay off in the long run. However, this strategy proved to fail when the Debtor's customers started to suffer and the Debtor accumulated large debts and started to run out of cash to finance the growth. Employees were overworked and started to quit, customer service quality declined, and warehouse space operated at close to 200% of the maximum capacity, which affected cost of goods sold. Furthermore, shipping errors started to accumulate, which resulted in chargebacks from customers that the Debtor had to absorb.

13.     During this time, the Debtor acquired many new customers. As a result, the Debtor needed to increase its footprint by several hundred thousand square feet. In order to accomplish this task, the Debtor had to re-invest its profits and borrow funds in order to finance its growth plan. The Debtor financed some of the growth through a loan, extended terms with vendors, and capital contribution from its principals.

14.     In late 2017, the Debtor lost some of its new customers. This loss coupled with the debts incurred as a result of the Debtor's attempted expansion left the Debtor in a situation where the Debtor no longer had the new customer income to service its increased debt. Ultimately, the Debtor came to the realization that its attempted growth plan was unsuccessful in terms of the projected revenue that had motivated the growth plan in the first place.

15.     In 2018, the Debtor decided to consolidate some of its facilities by closing one of its facilities located in Pico Rivera, which helped to stabilize the Debtor's business and cash flow. However, the Debtor remained behind on its payments, including on payments owed to its staffing agencies that supply the majority of the Debtor's labor force.

16.     On May 13, 2019, one of the Debtor's staffing agencies, Workforce, obtained a pre-petition judgment against the Debtor in the amount of $4,255,370.44 (the "Judgment").

Thereafter, I understand that on July 18, 2019, Workforce recorded an abstract of Judgment with the Los Angeles Recorder's Office, but did not record a notice of lien on account of the Judgment with the California Secretary of State. Between the Judgment and the Debtor's other pre-petition debt, the Debtor did not have the ability to satisfy its pre-petition debt or to stop legal pursuit of its creditors, a number of whom commenced pre-petition litigation. While the Debtor believes that it has a viable business that will succeed long into the future, the Debtor has no financial ability to pay off its extensive current debt.

17.    I believe that without a restructuring or significant reduction in the amount of the Debtor's current debt, the Debtor would be forced to shut down and liquidate its business, which I believe would likely result in no distribution to the Debtor's general unsecured creditors, cause the loss of hundreds of jobs of the Debtor's employees, and cause a massive disruption to the Debtor's many customers and their businesses who rely substantially on the services provided by the Debtor to them to enable them to get their product delivered to their customers. In order to protect its assets and operations, maintain and enhance the going concern value of the Debtor's business, and avoid a shut down and liquidation of the Debtor's business, the Debtor filed its bankruptcy case.

18.    The racking system located at the Santa Fe Springs warehouse location is not owned by the Debtor, but, rather, is leased by the Debtor pursuant to an equipment lease with Wells Fargo Equipment Finance, Inc. That lease is personally guaranteed by the Debtor's principal. It is my understanding that the current outstanding balance owing under that equipment lease is approximately $465,857. A copy of that lease is attached hereto as Exhibit "A". While I assume that any buyer who desires to take an assignment of the Santa Fe Springs warehouse lease will also want to take an assignment of the corresponding Wells Fargo equipment lease, I do not believe that this lease would have any independent value to any other

party.  The racking system located at the E. 37th Street Vernon warehouse location is owned outright by the Debtor.  It is an old racking system that I believe has negligible value.  From my own independent research of used racking systems, I believe that this racking system may have current resale value of approximately $50,000 it if could be removed from the E. 37th Street Vernon warehouse location (recognizing that one, the landlord may contend that they constitute fixtures and may not be removed from the property, and, two, the cost of removing the racking system would be substantial).

19.     The final assets of the Debtor of any significance that are not included in the balance sheet are the customer contracts that the Debtor has with its current 42 customers.  Without customers (and a very high volume of customers given the Debtor's massive overhead), the Debtor has no business because servicing its customers is the Debtor's sole source of revenue.  However, the Debtor's ability to retain its customers is solely and entirely dependent upon the Debtor maintaining its business relationship with its customers and its customers continuing to believe that the Debtor is able to properly service its customers' needs.  The services provided by the Debtor to its customers is of absolutely critical importance to the Debtor's customers because if the Debtor fails to package, ship and deliver its customers' product on time to the correct location the impact upon the Debtor's customers would be devastating.  There is no real way to quantify the value of these customer contracts to any buyer of the Debtor's assets because they only would have value if a buyer is able to persuade the customers to continue doing business with them and doing business on terms which are profitable for the buyer.  I am the primary representative of the Debtor that interfaces with and has the personal relationship with the Debtor's customers.  Of course, I am always trying to land new customers for the Debtor on profitable terms but landing any new customers while the Debtor is in chapter 11 will be extremely difficult.  While the Debtor has an excellent

relationship (and typically a long-standing relationship) with its customers, those customers have made clear to me that they are concerned about the Debtor's bankruptcy filing and want to see the Debtor emerge from chapter 11 quickly. That is the primary reason why I believe that it is critically important for the Debtor to consummate an asset sale by December 31, 2019 because the beginning of each calendar year is when the Debtor would be most vulnerable for its customers to leave and transfer their business to a competitor. That is why I believe that attempting to pursue a long and expensive plan of reorganization process, particularly one that is not overwhelmingly supported by the Debtor's largest creditors, is not a viable economic option as there is no way for me to know if its business could even survive such a process.

20. For all of the reasons explained above, I have very serious concerns about the viability of the Debtor's ongoing business if the Debtor is not able to consummate an asset sale by December 31, 2019 because I have no way of knowing if the Debtor will be able to retain its customers – without which the Debtor has no business. Moreover, the Debtor is in the middle of its strong season and therefore has adequate capital to operate its business (provided the Debtor is able to retain its customers during this process). The first six months of 2020 are the Debtor's slow season, and I believe that the Debtor is undercapitalized. I do not believe that it will be realistic for the Debtor to be able to obtain any additional funding during the Debtor's bankruptcy case with the Debtor's current balance sheet, and there is a serious question as to whether the Debtor, without additional funding, will have sufficient working capital to survive through the first six months of 2020.

21. As a result, I believe that it is critically important for the Debtor to consummate a sale of its assets by December 31, 2019, which is why the Debtor instructed its counsel to file the sale procedures motion in the first place. Given the fact that Sherwood Partners already conducted a comprehensive sale process a number of months prior to the Debtor's bankruptcy

filing and is now conducting another robust free and clear chapter 11 asset sale process, I am confident that the outcome of the current Auction sale process will result in the highest and best price that is available in the marketplace for the Debtor's assets.

22.     Depending upon the outcome of the Auction, of course, I believe that a free and clear going concern sale of the Purchased Assets (provided a reasonably fair price is paid for them) will be a significantly superior option to a shut down and liquidation of the Debtor's business, and I am confident that the liquidation analysis being prepared by Sherwood Partners will support that conclusion. If there was a shut down and liquidation of the Debtor's business, there would be utter chaos for the Debtor's customers who would have to figure out how to relocate the massive amount of their merchandise at the Debtor's three enormous warehouse facilities, pay for that relocation and find a viable competitor who could quickly step in and replace the Debtor. In my opinion, there can be no doubt that the Debtor's customers would offset all of their costs incurred in this process (and rightfully so) against any outstanding accounts receivable that they would owe the Debtor at that time, which I believe would likely result in a zero recovery or close to it from the Debtor's accounts receivable.

23.     For all of the reasons outlined above and in the concurrently filed Declaration of Gladys Francisco, I believe that the balance of the Debtor's assets would have negligible value in a shutdown and liquidation of the Debtor's business. Since I understand that the Debtor's cash would need to be used to satisfy the Debtor's secured and/or post-petition debt, I do not believe that there would be any recovery whatsoever for unsecured creditors in a shut down and liquidation of the Debtor's business. I also do not believe that a more orderly and controlled closing down of the Debtor's business would yield any better result for the Debtor's unsecured creditors because the Debtor would need to maintain its massive overhead structure, including employee staffing and rent to landlords (with such rent amounting to a total of approximately

$416,832 per month for the three warehouse locations and business office), to effectuate such an orderly and controlled closing down of the Debtor's business while the Debtor's customers transition to a competitor of the Debtor's in an orderly manner.  I believe that the additional overhead costs that the Debtor would have to incur during this process would offset any additional payments the Debtor would receive from its customers on outstanding accounts receivable which, as indicated, those customers would be unlikely to pay at all in a shut down and liquidation of the Debtor's business.

24.    I have no way of knowing at this time who the qualified bidders will be at the Auction.  My hope is that there will be multiple bidders who create a robust bidding process.  The only insider that I am aware of who might be a bidder at the Auction is the Debtor's principal, Jilali El Basri ("JEB").  Pursuant to the Sale Procedures Order, bidders are required to become qualified bidders by November 15, 2019 in order to participate in the Auction on November 20, 2019.  It is the intention of the Debtor to file a supplement to this Motion prior to the Auction to update the Court, and I understand that it will be the responsibility of the Winning Bidder to demonstrate its good faith.

25.    For the Debtor's part, I am not aware of any fraud, collusion or attempt to take unfair advantage by any prospective bidder of any other bidders.  Additionally, the current form of the Template APA is the version that has been approved by the Court to be used as the Template APA and I understand that it includes the changes requested by the United States Trustee and Workforce.  I assume that each qualified bidder will provide its requested changes to the Template APA.  I assume that the Debtor's negotiations with any prospective bidder over the form and terms of the Template APA will be at arm's length with all parties involved acting in good faith.

26.     JEB is the only creditor that I am aware of that assert any valid liens against any of the Purchased Assets, and JEB has advised the Debtor that he consents to the sale of the Purchased Assets to the Winning Bidder free and clear of his Encumbrances provided his Encumbrances are paid in full out of the sale proceeds or his Encumbrances attach to the sale proceeds with the same validity, extent and priority as his pre-petition Encumbrances.  The only other lien holder that I am aware of is the abstract of judgment that I understand creditor Workforce recorded in the County Recorder's office, but the Debtor does not own any real estate, and the Workforce abstract was recorded within 90 days of the date of the Debtor's bankruptcy filing which I understand makes it avoidable as a preference.

27.     For all of the reasons set forth above, I believe that selling the Purchased Assets to the Winning Bidder in accordance with the timeline provided in the Template APA and the Sales Procedures Order (unless the Winning Bidder and the Debtor agree otherwise and the Court approves of it) is in the best interests of the Debtor's estate and its creditors.  I believe that closing the Debtor's sale of the Purchased Assets to the Winning Bidder as soon as the Winning Bidder is able reduces the risk to this estate of the Debtor continuing in a bankruptcy case and bear all of the uncertainties associated therewith.

28.     As a final point, I do wish to correct the record regarding a statement I previously made in my declaration filed in support of the Debtor's sale procedures motion.  In paragraph 10 of that Declaration, I stated that "The Debtor's principal assets consist of its cash on hand, its accounts receivable, which total approximately $1.2 million, the security deposits held by the Debtor's landlords and the Debtor's leasehold interests held in connection with the leases of the warehouses out of which the Debtor operates."  What I meant when I stated that the Debtor's accounts receivable "total approximately $1.2 million", I was referring to what I understood to be the Debtor's average billed accounts receivable at any given point in time,

including the figures included in the Debtor's bankruptcy schedules as of August 30, 2019. Since the conclusion of the hearing on the Debtor's sale procedures motion, I have spent significant time with the Debtor's controller, Gladys Francisco, and the Debtor's long time outside accountant, Harold West of Fineman West Co. LLP, to make sure I fully understand how the Debtor's accounts receivable are booked and accounted for, all of which is explained in detail in the concurrently filed Declaration of Gladys Francisco.  I now understand that because this is the Debtor's busiest season, the Debtor's total accounts receivable – both billed and unbilled – at the time I filed my prior declaration was materially higher than the $1.2 million figure I stated in that Declaration, but I understood that figure to be correct at the time I signed that Declaration.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 30th day of October, 2019, at Los Angeles, California.

_____
KHALID LEMKIN

# EXHIBIT "A"

# Equipment Lease

## Agreement of Sale

*Wells Fargo Equipment Finance, Inc. | 600 South 4th Street | MAC N9300-100 | Minneapolis, MN 55415*



| | Equipment Lease Num | 8-400 dated as of February 1, 2018 |

Name and Address of Lessee:

**West Coast Distribution, Inc.**
**4519 Everett Avenue**
**Vernon, CA 90058**

> **Notice:** Lessor reserves the right to withdraw the terms of this Lease and issue a modified Lease without notice to Lessee if Lessor is not in receipt of a fully executed original or facsimile of this document within five (5) business days of the date of this Lease. However, in that event, no such modifications will be binding on Lessee unless and until Lessee executes the modified document containing all such modifications.

**Equipment Description:**
**New Racking Materials, as more completely detailed on Yale Chase Equipment and Services, Inc. invoice #SI11268 dated December 22, 2017.**

After Lessee signs this Lease, Lessee authorizes Lessor to insert any missing information or change any inaccurate information (such as the model year of the Equipment or its serial number or VIN) into this Equipment Description.

**Equipment Location: 12828 Carmenita Avenue, SANTA FE SPRINGS, CA 90670**

**Acceptance Date:** See separate Delivery and Acceptance Certificate

| SUMMARY OF PAYMENT TERMS | |
|---|---|
| Initial Term (Months): **60** | Total Cost: **$665,622.33** |
| Payment Frequency: **Monthly** | Total Basic Rent: **$762,504.60** |
| Basic Rental Payment: **$12,708.41 plus applicable sales and use tax** | Purchase Agreement: **$1.00** |
| Number of Installments: **60** | Cutoff Date: **4/30/2018** |
| Advance Payments: **First due on signing Lease** | Security Deposit: **N/A** |

**Lease Provisions**

**1.    LEASE.** Lessee hereby agrees to lease from Lessor, the personal property described on the first page of this Lease on the terms and conditions set forth herein (such property together with all replacements, substitutions, parts, improvements, repairs, and accessories and all additions incorporated therein or affixed thereto being referred to herein as the "Equipment"). Lessee's execution of this Lease shall obligate Lessee to lease the Equipment from Lessor. This Lease shall not be binding on Lessor unless and until executed by Lessor. Anything to the contrary notwithstanding, Lessor shall have no obligation to accept, execute or enter into this Lease or to acquire or lease to Lessee the Equipment. Lessee grants Lessor a security interest in the Equipment to secure its obligations under this Lease and all other indebtedness at any time owing by Lessee to Lessor.

**2.    EQUIPMENT ACCEPTANCE; TERM; RENT.** The "Acceptance Date" for the Equipment shall be (a) the date Lessee accepts the Equipment under a separately signed Delivery and Acceptance Certificate, or (b) the date set forth on the first page of this Lease and Lessee represents and warrants that as of such date, the Equipment has been delivered to Lessee, Lessee has unconditionally accepted the Equipment and Lessee agrees that the Equipment is subject to this Lease. Lessee agrees that if all of the items of Equipment have not been delivered and accepted hereunder before the Cutoff Date as set forth above, Lessor shall have no obligation to lease the Equipment to Lessee. The term of this Lease shall begin on the Rent Commencement Date and shall continue for the Initial Term as set forth above unless earlier terminated by Lessor as provided herein. The Rent Commencement Date is the Acceptance Date.

Lessee shall pay as basic rent for the Initial Term of this Lease the amount shown above as Total Basic Rent (subject to adjustment as set forth below). The Total Basic Rent shall be payable in installments each in the amount of the Basic Rental Payment set forth above (subject to adjustment as set forth below) plus any applicable sales and use tax thereon beginning on the Rent Commencement Date and continuing on the same day of each subsequent month during the Initial Term. If the actual cost of the Equipment is more or less

**THIS AGREEMENT INCLUDES THE TERMS ON THE ATTACHED PAGE(S).**

Lessor: Wells Fargo Equipment Finance, Inc.    Lessee: West Coast Distribution, Inc.



By    By                                X

**Kurt Wilhelmy**

Title    **Authorized Signer**    Title

**2/6/18**

Rent Commencement Date

A-EQ

 

than the Total Cost as shown above, the amount of each installment of rent will be adjusted up or down to provide the same yield to Lessor as would have been obtained if the actual cost had been the same as the Total Cost. The Basic Rental Payment amount and the Total Basic Rent set forth above were calculated based on Lessor's cost of funds on the date of this Lease set forth above. Notwithstanding anything in this Lease to the contrary, unless the Acceptance Date has already occurred and is set forth above as referenced in clause (b) of the first paragraph of this Section, if Lessor has not received a Delivery and Acceptance Certificate signed by Lessee within fifteen (15) business days of the date of this Lease and Lessor's cost of funds has increased subsequent to the date of this Lease, the Basic Rental Payment amount and the Total Basic Rent will be increased to provide the same yield to Lessor as would have been obtained if Lessor's cost of funds had not increased. The Basic Rental Payment amount and the Total Basic Rent shall be calculated by Lessor taking into account its cost of funds two business days prior to the date that this Lease is funded. Lessee agrees that the funding date shall not occur until Lessor has received all documentation and information required by Lessor, which may include, without limitation, evidence of insurance, invoices, landlord waivers and evidence of no adverse liens or security interests on the Equipment. In such event Lessee and Lessor shall sign an amendment to this Lease reflecting the change in Total Basic Rent and Basic Rental Payment.

If any payment due hereunder is not received by Lessor within ten (10) days of its due date, Lessee agrees to pay a late fee to Lessor equal to the lesser of (i) 5% of the past due amount or (ii) the highest amount allowed by applicable law. Payments thereafter received shall be applied first to delinquent installments and then to current installments.

**3. SECURITY DEPOSIT.** Upon execution of this Lease, Lessee shall pay to Lessor the Security Deposit, if any, set forth above. Lessor may apply any security deposit toward any obligation of Lessee, and shall return any unapplied balance to Lessee without interest upon full satisfaction of Lessee's obligations.

**4. NO WARRANTIES.** Lessee agrees that it has selected each item of Equipment based upon its own judgment and disclaims any reliance upon any statements or representations made by Lessor. LESSEE ACKNOWLEDGES THAT: LESSOR IS NOT THE MANUFACTURER OF THE EQUIPMENT NOR THE MANUFACTURER'S AGENT NOR A DEALER THEREIN; THE EQUIPMENT IS OF A SIZE, DESIGN, CAPACITY, DESCRIPTION AND MANUFACTURE SELECTED BY LESSEE; LESSEE IS SATISFIED THAT THE EQUIPMENT IS SUITABLE AND FIT FOR ITS PURPOSES; AND LESSOR HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY WITH RESPECT TO THE EQUIPMENT, EXPRESS OR IMPLIED AND LESSOR SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE, OR AS TO THE QUALITY, CONDITION OR CAPACITY OF THE EQUIPMENT OR THE MATERIALS IN THE EQUIPMENT OR WORKMANSHIP OF THE EQUIPMENT, LESSOR'S TITLE TO THE EQUIPMENT, OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER. LESSOR SHALL NOT BE LIABLE TO LESSEE FOR ANY LOSS, DAMAGE, OR EXPENSE OF ANY KIND OR NATURE CAUSED, DIRECTLY OR INDIRECTLY, BY ANY EQUIPMENT OR THE USE OR MAINTENANCE THEREOF OR THE FAILURE OR OPERATION THEREOF, OR THE REPAIR, SERVICE OR ADJUSTMENT THEREOF, OR BY ANY DELAY OR FAILURE TO PROVIDE ANY SUCH MAINTENANCE, REPAIRS, SERVICE OR ADJUSTMENT, OR BY AN INTERRUPTION OF SERVICE OR LOSS OF USE THEREOF OR FOR ANY LOSS OF BUSINESS HOWSOEVER CAUSED. LESSOR SHALL NOT BE LIABLE FOR DAMAGES OF ANY KIND INCLUDING ANY LIABILITY FOR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OF OR THE INABILITY TO USE THE EQUIPMENT. No defect or unfitness of the Equipment, and no failure on the part of the manufacturer or the shipper of the Equipment to deliver the Equipment or any part thereof to Lessee shall relieve Lessee of the obligation to pay rent or any other obligation hereunder. Lessor shall have no obligation in respect of the Equipment and shall have no obligation to install, erect, test, adjust or service the Equipment. Lessee shall only look to persons other than Lessor such as the manufacturer, vendor or carrier thereof should any item of Equipment for any reason and in any way be defective. To the extent permitted by the manufacturer and/or vendor and provided Lessee is not in default under the Lease, Lessor shall make available to Lessee all manufacturer and/or vendor warranties with respect to the Equipment.

**5. TAXES.** Lessee shall promptly pay when due and indemnify and hold Lessor harmless (on an after-tax basis) from, all sales, use, property, excise and other taxes and all license and registration fees now or hereafter imposed by any governmental body or agency upon the Equipment or its use, purchase, ownership, delivery, leasing, possession, storage, operation, maintenance, repair, return or other disposition of the Equipment, or for titling or registering the Equipment, or upon the income or other proceeds received with respect to the Equipment or Lease or the rentals hereunder; provided, however, that Lessee shall not be required to pay taxes on or measured by the net income of Lessor. Upon request by Lessor, Lessee shall prepare and file all tax returns relating to taxes for which Lessee is responsible hereunder which Lessee is permitted to file under the laws of the applicable taxing jurisdiction. Upon the expiration or earlier termination of the Lease, Lessee shall pay to Lessor any such taxes accrued or assessed but not yet due and payable.

**6. INDEMNITY.** Lessee hereby agrees to indemnify and hold Lessor harmless (on an after-tax basis) from and against any and all claims, losses, liabilities (including negligence, tort and strict liability), damages, judgments, obligations, actions, suits and all legal proceedings, and any and all costs and expenses in connection therewith (including attorneys' fees) arising out or in any manner connected with, or resulting directly or indirectly from, the Equipment, including, without limitation, the manufacture, purchase, lease, financing, selection, ownership, delivery, rejection, non-delivery, transportation, possession, use, storage, operation, condition, maintenance, repair, return or other disposition of the Equipment or with this Lease, including without limitation, claims for injury to or death of persons and for damage to property, whether arising under the doctrine of strict liability, by operation of law or otherwise, and to give Lessor prompt notice of any such claim or liability.

**7. ASSIGNMENT; STATUS OF LESSEE.** Lessor may sell or assign any or all of its interest in this Lease or sell or grant a security interest in all or any part of the Equipment without notice to or the consent of Lessee. Lessee agrees not to assert against any assignee of Lessor any setoff, recoupment, claim counterclaim or defense Lessee may have against Lessor or any person other than such assignee. LESSEE SHALL NOT (a) ASSIGN OR IN ANY WAY TRANSFER OR DISPOSE OF ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS UNDER THIS LEASE, (b) ENTER INTO ANY SUBLEASE OF ALL OR ANY PART OF THE EQUIPMENT, (c) sell, transfer or assign any material portion of its assets, (d) allow a controlling interest in Lessee to be sold, transferred or assigned to any person(s) or entity(ies) other than those who hold a controlling interest as of the date hereof whether by merger, sale or otherwise, (e) allow a Blocked Person to have an ownership interest in or control of Lessee, (f) enter into any merger or reorganization in which Lessee is not the surviving entity, or (g) unless Lessee shall have given Lessor no less than thirty (30) days' prior written notice change (i) its name or business address from that set forth above, and, if an individual, its state of residence, (ii) the state under whose laws it is organized as of the date hereof, or (iii) the type of organization under which it exists as of the date hereof. "Blocked Person" means any person or entity that is now or at any time (A) on a list of Specially Designated Nationals issued by the Office of Foreign Assets Control ("OFAC") of the United States Department of the Treasury or any sectoral sanctions identification list, or (B) whose property or interests in property are blocked by OFAC or who is subject to sanctions imposed by law, including any executive order of any branch or department of the United States government or (C) otherwise designated by the United States or any regulator having jurisdiction or regulatory oversight

 

over Lessor, to be a person with whom Lessor is not permitted to extend credit to or with regard to whom, a lessee relationship may result in penalties against Lessor or limitations on a lessor's ability to enforce a transaction.

**8.   OWNERSHIP; LOCATION; USE AND MAINTENANCE.** Lessee agrees that the Equipment is and shall remain personal property and shall not permit it to become attached to real property. Lessee shall not permit, suffer or allow any liens, charges or encumbrances to be placed on or levied against the Equipment and shall at all times keep the Equipment free and clear of all such liens, charges and encumbrances. Lessee shall not without prior written notice to Lessor, remove or allow any of the Equipment to be removed from the Equipment Location specified above. Lessee will use the Equipment with due care and only for the purpose for which it is intended. Lessee will maintain the Equipment in good repair, condition and working order and will furnish all parts and services required therefor, all at its expense, ordinary wear and tear excepted. Lessee shall, at its expense, make all modifications and improvements to the Equipment required by law, and shall not make other modifications or improvements to the Equipment without the prior written consent of Lessor. All parts, modifications and improvements to the Equipment shall, when installed or made, immediately become the property of Lessor and part of the Equipment for all purposes. Lessee shall, at any and all times during business hours, grant Lessor free access to enter upon the premises wherein the Equipment shall be located or used and permit Lessor to inspect the Equipment and all applicable maintenance records. The Equipment shall not be used outside of the United States without Lessor's prior written consent.

**9.   LOSS OR DAMAGE.** No loss or damage to the Equipment or any part thereof shall affect any obligation of Lessee under this Lease which shall continue in full force and effect. Lessee shall advise Lessor in writing within five (5) days of any item of Equipment becoming lost, stolen or damaged and of the circumstances and extent of such damage. In the event any item of Equipment shall become lost, stolen, destroyed, damaged beyond repair or rendered permanently unfit for use for any reason, or in the event of condemnation or seizure of any item of Equipment, Lessee shall promptly, within ten (10) days after demand by Lessor, pay Lessor an amount equal to Lessor's Loss as defined in paragraph 14 with respect to such item at the time of payment based on the proportion that the original cost of such item bears to the Total Cost of all items of Equipment. Upon payment of such amount to Lessor, such item shall become the property of Lessee, Lessor will transfer to Lessee, without recourse or warranty, all of Lessor's right, title and interest therein, the rent with respect to such item shall terminate, and the Basic Rental Payments on the remaining items shall be reduced accordingly. Lessee shall pay any sales and use taxes due on such transfer. Any insurance or condemnation proceeds received shall be credited to Lessee's obligation under this paragraph and Lessee shall be entitled to any surplus. Whenever the Equipment is damaged and such damage can be repaired, Lessee shall, at its expense, promptly effect such repairs as Lessor shall deem necessary for compliance with paragraph 8 above. Proceeds of insurance shall be paid to Lessor with respect to such reparable damage to the Equipment and shall, at the election of Lessor, be applied either to the repair of the Equipment by payment by Lessor directly to the party completing the repairs, or to the reimbursement of Lessee for the cost of such repairs; provided, however, that Lessor shall have no obligation to make such payment or any part thereof until receipt of such evidence as Lessor shall deem satisfactory that such repairs have been completed and further provided that Lessor may apply such proceeds to the payment of any rent or other sum due or to become due hereunder if at the time such proceeds are received by Lessor there shall have occurred any Event of Default or any event which with lapse of time or notice, or both, would become an Event of Default.

**10. INSURANCE.** Lessee shall obtain and maintain on or with respect to the Equipment at its own expense (a) liability insurance (including bodily injury and property damage) with a minimum $1 million combined single limit per occurrence and (b) all-risk physical damage insurance insuring against loss or damage to the Equipment in an amount not less than the full replacement value of the Equipment. Lessee shall furnish Lessor with a certificate of insurance evidencing the issuance of a policy or policies to Lessee in at least the minimum amounts required herein naming Lessor as an additional insured thereunder for the liability coverage and as (i) loss payee for the property damage coverage if the aggregate original cost of the Equipment leased hereunder is $1 million or less, or (ii) lender loss payee for the property damage coverage if the aggregate original cost of the Equipment leased hereunder exceeds $1 million. Each such policy shall be in such form and with such insurers as may be satisfactory to Lessor, and shall contain a clause specifying that no action or misrepresentation by Lessee shall invalidate such policy and a clause requiring the insurer to give to Lessor at least thirty (30) days' prior written notice of (i) the cancellation or non-renewal of such policy or (ii) any amendment to the terms of such policy if such amendment would cause the policy no longer to conform to the policy requirements stated in this paragraph; and ten (10) days prior notice of cancellation for non-payment of premium. Lessee shall deliver to Lessor, annually and upon renewal or replacement of any insurance required herein, evidence satisfactory to Lessor of the required insurance coverage. Lessee hereby assigns to Lessor the proceeds of all such insurance and directs any insurer to make payments directly to Lessor. Lessor shall be under no duty to ascertain the existence of or to examine any such policy or to advise Lessee in the event any such policy shall not comply with the requirements hereof.

**11. PURCHASE.** Upon expiration of this Lease, Lessee shall pay (a) the amount of all rent and other amounts owed by Lessee hereunder but unpaid as of such date and, (b) the dollar amount specified in the "Purchase Agreement" box on the first page of this Lease, plus applicable sales tax. Upon receipt of such amounts, the Equipment shall be deemed transferred to Lessee at its then location. Lessor hereby warrants that at the time of transfer the Equipment will be free of all security interests and other liens created by Lessor or in favor of persons claiming through Lessor. LESSOR MAKES NO OTHER WARRANTY WITH RESPECT TO THE EQUIPMENT, EXPRESS OR IMPLIED, AND SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY AND OF FITNESS FOR A PARTICULAR PURPOSE AND ANY LIABILITY FOR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OF OR THE INABILITY TO USE THE EQUIPMENT. Lessor makes no representation with respect to the income tax consequences of the transaction evidenced by this Lease. Lessor will treat the lease as a sale regardless of how the Lease is treated by Lessee.

**12. ADDITIONAL ACTION.** Lessee will promptly execute and deliver to Lessor such further documents, take such further action and provide such information as Lessor may request in order to carry out more effectively the intent and purpose of this Lease, and/or comply with laws or regulations applicable to Lessor, Lessee, and/or the transaction evidenced by this Lease, including information identifying the owners of Lessee and its affiliates and their respective ownership interests. Lessor and any assignee of Lessor is authorized to file one or more Uniform Commercial Code financing statements without the signature of Lessee. Lessee hereby grants to Lessor a power of attorney in Lessee's name, to apply for a certificate of title for any item of Equipment that is required to be titled under the laws of any jurisdiction where the Equipment is or may be used and/or to transfer title thereto upon the exercise by Lessor of its remedies upon an Event of Default by Lessee under this Lease. Lessee will pay (or reimburse Lessor for) the reasonable costs and expenses related to (a) filing any financing, continuation or termination statements, (b) any title and lien searches with respect to this Lease and the Equipment, (c) any documentary stamp taxes relating to the Lease, and (d) procuring certified charter documents and good standing certificates of Lessee and any guarantor of Lessee's obligations hereunder. Lessee will do whatever may be necessary to have a statement of the interest of Lessor and any assignee of Lessor in the Equipment noted on any certificate of title relating to the Equipment and will deliver said certificate to Lessor. If Lessee fails to perform or comply with any of its agreements, Lessor may perform



or comply with such agreements in its own name or in Lessee's name as attorney-in-fact and the amount of any payments and expenses of Lessor incurred in connection with such performance or compliance, together with interest thereon at the rate provided below, shall be deemed rent payable by Lessee upon demand.

**13. DEFAULT.** Each of the following events shall constitute an "Event of Default" hereunder: (a) Lessee shall fail to pay within ten (10) days of when due any installment of interim rent, basic rent or any other amount due hereunder; (b) any certificate, statement, representation, warranty or financial or credit information heretofore or hereafter made or furnished by or on behalf of Lessee or any guarantor of any of Lessee's obligations hereunder (a "Guarantor") proves to have been false or misleading in any material respect or omitted any material fact, contingent or unliquidated liability or claim against Lessee or any such Guarantor; (c) Lessee shall fail to observe or perform any other agreement to be observed or performed by Lessee hereunder and the continuance thereof for ten (10) days following the earlier of (i) written notice thereof by Lessor to Lessee or (ii) Lessee's first knowledge thereof; (d) Lessee or any Guarantor or any partner of Lessee if Lessee is a partnership shall cease doing business as a going concern, make an assignment for the benefit of creditors, become insolvent, or engage in any dissolution or liquidation proceedings; (e) Lessee or any Guarantor or any partner of Lessee if Lessee is a partnership shall voluntarily file, or have filed against it involuntarily, a petition for liquidation, reorganization, adjustment of debt, or similar relief under the federal Bankruptcy Code or any other present or future federal or state bankruptcy or insolvency law, or a trustee, receiver, or liquidator shall be appointed of it or of all or a substantial part of its assets; (f) any individual Lessee, Guarantor , or partner of Lessee if Lessee is a partnership shall die; (g) Lessee or any Guarantor shall be in breach of or in default in the payment or performance of any material obligation under any credit agreement, conditional sales contract, lease, guaranty, or other contract with Lessor, an affiliate of Lessor or any other person or entity, howsoever arising; (h) Lessee, or any Guarantor shall suffer a material adverse change in its financial condition from the date hereof, and as a result thereof Lessor deems itself or any of the Equipment to be insecure; (i) any Guarantor fails to pay or perform any term, condition, covenant, representation or warranty contained in any agreement made by such Guarantor in favor of Lessor and such failure or breach continues beyond the applicable grace or cure period set forth in such agreement, if any; or (j) Lessee, any Guarantor, or any principal owner, senior officer or director of Lessee or of any Guarantor is convicted of a felony.

**14. REMEDIES.** Lessor and Lessee agree that Lessor's damages suffered by reason of an Event of Default are uncertain and not capable of exact measurement at the time this Lease is executed because the value of the Equipment at the expiration of this Lease is uncertain, and therefore they agree that for purposes of this paragraph 14 "Lessor's Loss" as of any date shall be the sum of the following: (1) the amount of all rent and other amounts payable by Lessee hereunder due but unpaid as of such date plus (2) the amount of all unpaid rent for the balance of the term of this Lease not yet due as of such date discounted from the respective dates installment payments would be due at the Discount Rate as defined below plus (3) the Purchase Agreement as specified on the first page of this Lease. "Discount Rate" means (i) the rate set forth for the United States Treasury Bond or Note having the closest term to (but not longer than) the original term of this Lease, as set forth in the Wall Street Journal two business days prior to the Rent Commencement Date, (ii) the rate set forth for the United States Treasury Bond or Note having the closest term to (but not longer than) the remaining term of this Lease, as set forth in the Wall Street Journal two business days prior to the date of calculation of Lessor's Loss, or (iii) 3%, whichever is lowest. If a rate referred to in the preceding clauses "(i)" or "(ii)" is not published in the Wall Street Journal, such rate shall be taken from a reputable source selected by Lessor. Upon the occurrence of an Event of Default and at any time thereafter, Lessor may exercise any one or more of the remedies listed below as Lessor in its sole discretion may lawfully elect; provided, however, that upon the occurrence of an Event of Default specified in paragraph 13(e), an amount equal to Lessor's Loss as of the date of such occurrence shall automatically become and be immediately due and payable without notice or demand of any kind. The exercise of any one remedy shall not be deemed an election of such remedy or preclude the exercise of any other remedy, and such remedies may be exercised concurrently or separately but only to the extent necessary to permit Lessor to recover amounts for which Lessee is liable hereunder.

(a)  Lessor may, by written notice to Lessee, terminate this Lease as to any or all of the Equipment subject hereto and declare an amount equal to Lessor's Loss as of the date of such notice to be immediately due and payable, as liquidated damages and not as a penalty, and the same shall thereupon be and become immediately due and payable without further notice or demand, and all rights of Lessee to use the Equipment shall terminate but Lessee shall be and remain liable as provided in this paragraph 14. Lessee shall at its expense promptly deliver the Equipment to Lessor at a location or locations within the continental United States designated by Lessor. Lessor may also enter upon the premises where the Equipment is located and take immediate possession of and remove the same with or without instituting legal proceedings.

(b)  Lessor may proceed by appropriate court action to enforce performance by Lessee of the applicable covenants of this Lease or to recover, for breach of this Lease, Lessor's Loss as of the date Lessor's Loss is declared due and payable hereunder; provided, however, that upon recovery of Lessor's Loss from Lessee in any such action without having to repossess and dispose of the Equipment, Lessor shall transfer the Equipment to Lessee at its then location upon payment of any additional amount due under clauses (d), (e) and (f) below.

(c)  In the event Lessor repossesses the Equipment, Lessor shall either retain the Equipment in full satisfaction of Lessee's obligation hereunder or sell or lease each item of Equipment in such manner and upon such terms as Lessor may in its sole discretion determine. The proceeds of any such sale or lease shall be applied to reimburse Lessor for Lessor's Loss and any additional amount due under clauses (d), (e) and (f) below. Lessee shall be entitled to any surplus and shall remain liable for any deficiency.

(d)  Lessor may recover interest on the unpaid balance of Lessor's Loss plus any amounts recoverable under clauses (e) and (f) of this paragraph 14 from the date it becomes payable until fully paid at the rate of the lesser of 12% per annum or the highest rate permitted by law.

(e)  In addition to any other recovery permitted hereunder or under applicable law, Lessor may recover from Lessee an amount that will fully compensate Lessor for any loss of or damage to Lessor's residual interest in the Equipment.

(f)  Lessor may exercise any other right or remedy available to it by law or by agreement, and may in any event recover legal fees and other costs and expenses incurred by reason of an Event of Default or the exercise of any remedy hereunder, including expenses of repossession, repair, storage, transportation, and disposition of the Equipment. Any payment received by Lessor may be applied to unpaid obligations as Lessor in its sole discretion determines.

Lessee agrees that upon the occurrence of an Event of Default, in addition to all of the other rights and remedies available to Lessor hereunder, Lessor shall have all of the rights and remedies of a secured party under the Uniform Commercial Code. No express or

 

implied waiver by Lessor of any breach of Lessee's obligations hereunder shall constitute a waiver of any other breach of Lessee's obligations hereunder.

**15. NET LEASE AND UNCONDITIONAL OBLIGATION.** This Lease is a completely net lease and Lessee's obligation to pay rent and amounts payable by Lessee hereunder is unconditional and irrevocable and shall be paid without any abatement, reduction, setoff or defense of any kind. This Lease cannot be canceled, prepaid or terminated except as expressly provided herein.

**16. NON-WAIVER.** No course of dealing between Lessor and Lessee or any delay or omission on the part of Lessor in exercising any rights hereunder shall operate as a waiver of any rights of Lessor. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. No waiver or consent shall be binding upon Lessor unless it is in writing and signed by Lessor. To the extent permitted by applicable law, Lessee hereby waives the benefit and advantage of, and covenants not to assert against Lessor, any valuation, inquisition, stay, appraisement, extension or redemption laws now existing or which may hereafter exist which, but for this provision, might be applicable to any sale or re-leasing made under the judgment, order or decree of any court or under the powers of sale and hereby conferred by this Lease or otherwise. To the extent permitted by applicable law, Lessee hereby waives any and all rights and remedies conferred upon a Lessee by Article 2A-508 through 2A-522 of the Uniform Commercial Code, including but not limited to Lessee's rights to: (i) cancel this Lease; (ii) repudiate this Lease; (iii) reject the Equipment; (iv) revoke acceptance of the Equipment; (v) recover damages from Lessor for any breaches of warranty or for any other reason; (vi) claim a security interest in the Equipment in Lessee's possession or control for any reason; (vii) deduct all or any part of any claimed damages resulting from Lessor's default, if any, under this Lease; (viii) accept partial delivery of the Equipment; (ix) "cover" by making any purchase or lease of or contract to purchase or lease Equipment in substitution of Equipment identified to this Lease; (x) recover any general, special, incidental, or consequential damages, for any reason whatsoever; and (xi) specific performance, replevin, detinue, sequestration, claim, delivery or the like for any Equipment identified to this Lease.

**17. REPRESENTATIONS AND AGREEMENTS.** Lessee hereby represents and agrees that (a) effective on the date on which Lessee executes this Lease: (i) if Lessee is a partnership, corporation, limited liability company or other legal entity, the execution and delivery of this Lease and the performance of Lessee's obligations hereunder have been duly authorized by all necessary action on the part of the Lessee; (ii) the person signing the Lease on behalf of Lessee is duly authorized; (iii) all information provided by Lessee to Lessor in connection with this Lease is true and correct; and (iv) this Lease constitutes a legal, valid and binding obligation of Lessee, enforceable against Lessee in accordance with its terms; (b) the Equipment will be used primarily for business purposes as opposed to personal, family or household purposes; (c) Lessee shall comply with all federal, state and local laws, regulations and rules relating to the ownership or operation of Lessee's business, the Equipment and/or its use, (d) Lessee authorizes Lessor to pay the Total Cost as set forth on the first page of this Lease directly to the seller of the Equipment to the extent of the unpaid balance of the purchase price; and (e) Lessee shall (i) maintain a system of accounts established and administered in accordance with generally accepted accounting principles and practices consistently applied; (ii) within forty-five (45) days after the end of each fiscal quarter other than the final fiscal quarter of each fiscal year, deliver to Lessor a balance sheet and statement of income as at the end of such quarter, each setting forth in comparative form the corresponding figures for the comparable period in the preceding fiscal year and, within one hundred and twenty (120) days after the end of each fiscal year, deliver to Lessor a balance sheet as at the end of such year and statements of income and cash flows for such year, with accompanying notes to financial statements, each setting forth in comparative form the corresponding figures for the preceding year, in each case prepared in accordance with generally accepted accounting principles and practices consistently applied and certified by Lessee's chief financial officer as fairly presenting the financial position and results of operations of Lessee, and, in the case of year-end financial statements, certified by an independent accounting firm acceptable to Lessor; and (iii) with reasonable promptness, furnish Lessor with such other information, financial or otherwise, relating to Lessee or the Equipment as Lessor shall reasonably request.

**18. MISCELLANEOUS.** This Lease constitutes the entire agreement between Lessor and Lessee and may be modified only by a written instrument signed by Lessor and Lessee. Any provision of this Lease that is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions of this Lease, and any such unenforceability in any jurisdiction shall not render unenforceable such provision in any other jurisdiction. Notwithstanding anything to the contrary contained herein, if any rate of interest, late fee or any other charges or fees due hereunder are determined by a court of competent jurisdiction to be usurious, then said interest rate, fees and/or charges shall be reduced to the maximum amount permissible under applicable law and any such excess amounts shall be applied towards the Lessee's obligations hereunder. Paragraph headings are for convenience only, are not part of this Lease and shall not be deemed to effect the meaning or construction of any of the provisions hereof. In the event there is more than one Lessee named in this Lease, the obligations of each shall be joint and several. Lessee's obligations under paragraphs 5, 6, 11 and 14 shall survive termination or expiration of this Lease. Any written notice hereunder to Lessee or Lessor shall be deemed to have been given when delivered personally or deposited with a recognized overnight courier service or in the United States mails, postage prepaid, addressed to recipient at its address set forth on the first page of this Lease or at such other address as may be last known to the sender. Lessor may in its sole discretion, accept a photocopy, electronically transmitted facsimile or other reproduction of this Lease (a "Counterpart") as the binding and effective record of this Lease whether or not an ink signed copy hereof is also received by Lessor from Lessee, provided, however, that if Lessor accepts a Counterpart as the binding and effective record hereof, the Counterpart acknowledged in writing above by Lessor shall constitute the record hereof. Lessee represents to Lessor that the signature that appears on the Counterpart that is transmitted by Lessee to Lessor in any manner described above is intended by Lessee to authenticate the Counterpart notwithstanding that such signature is electronic, facsimile or a reproduction and Lessee further agrees that such Counterpart received by Lessor, shall, when acknowledged in writing by Lessor, constitute an original document for the purposes of establishing the provisions thereof and shall be legally admissible under the best evidence rule and binding on and enforceable against Lessee. If Lessor accepts a Counterpart as the binding and effective record hereof only such Counterpart acknowledged in writing above by Lessor may be marked "Original" and to the extent that this Lease constitutes chattel paper, perfection of a security interest by possession may only be accomplished by possession of the Counterpart that bears Lessor's ink signed acknowledgement and is marked "Original." This Lease shall in all respects be governed by, and construed in accordance with, the substantive laws of the state of Minnesota. TIME IS OF THE ESSENCE WITH RESPECT TO THE OBLIGATIONS OF LESSEE UNDER THIS LEASE.

**ARBITRATION:**
(a) Arbitration. The parties hereto agree, upon demand by any party, whether made before the institution of a judicial proceeding or not more than 60 days after service of a complaint, third party complaint, cross-claim, counterclaim or any answer thereto or any amendment to any of the above, to submit to binding arbitration all claims, disputes and controversies between or among them (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise arising out of or

 

relating to in any way (i) the Equipment, the leasing of the Equipment and related documents which are the subject of this Lease and its negotiation, execution, collateralization, administration, repayment, modification, extension, substitution, formation, inducement, enforcement, default or termination; or (ii) requests for additional credit. In the event of a court ordered arbitration, the party requesting arbitration shall be responsible for timely filing the demand for arbitration and paying the appropriate filing fee within the 30 days of the abatement order or the time specified by the court. Failure to timely file the demand for arbitration as ordered by the court will result in that party's right to demand arbitration being automatically terminated.

(b)  Governing Rules.  Any arbitration proceeding will (i) proceed in a location selected by the American Arbitration Association ("AAA"); (ii) be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between the parties; and (iii) be conducted by the AAA, or such other administrator as the parties shall mutually agree upon, in accordance with the AAA's commercial dispute resolution procedures, unless the claim or counterclaim is at least $1,000,000.00 exclusive of claimed interest, arbitration fees and costs in which case the arbitration shall be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes referred to herein, as applicable, as the "Rules"). If there is any inconsistency between the terms hereof and the Rules, the terms and procedures set forth herein shall control. Any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any dispute. Nothing contained herein shall be deemed to be a waiver by any party that is a bank of the protections afforded to it under 12 U.S.C. §91 or any similar applicable state law.

(c)  No Waiver of Provisional Remedies, Self-Help and Foreclosure.  The arbitration requirement does not limit the right of any party to (i) foreclose against real or personal property collateral; (ii) exercise self-help remedies relating to collateral or proceeds of collateral such as setoff or repossession; or (iii) obtain provisional or ancillary remedies such as replevin, injunctive relief, attachment or the appointment of a receiver, before during or after the pendency of any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of any party to submit any dispute to arbitration or reference hereunder, including those arising from the exercise of the actions detailed in sections (i), (ii) and (iii) of this paragraph.

(d)  Arbitrator Qualifications and Powers.  Any arbitration proceeding in which the amount in controversy is $5,000,000.00 or less will be decided by a single arbitrator selected according to the Rules, and who shall not render an award of greater than $5,000,000.00. Any dispute in which the amount in controversy exceeds $5,000,000.00 shall be decided by majority vote of a panel of three arbitrators; provided however, that all three arbitrators must actively participate in all hearings and deliberations. The arbitrator will be a neutral attorney licensed in, or a neutral retired judge of the state or federal judiciary of the state in which the arbitration proceeding takes place, in either case with a minimum of ten years' experience in the substantive law applicable to the subject matter of the dispute to be arbitrated. The arbitrator will determine whether or not an issue is arbitratable and will give effect to the statutes of limitation in determining any claim. In any arbitration proceeding the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication. The arbitrator shall resolve all disputes in accordance with the substantive law of Minnesota and may grant any remedy or relief that a court of such state could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any award. The arbitrator shall also have the power to award recovery of all costs and fees, to impose sanctions and to take such other action as the arbitrator deems necessary to the same extent a judge could pursuant to the Federal Rules of Civil Procedure, the Minnesota Rules of Civil Procedure or other applicable law. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

(e)  Discovery.  In any arbitration proceeding discovery will be permitted in accordance with the Rules. All discovery shall be expressly limited to matters directly relevant to the dispute being arbitrated and must be completed no later than 20 days before the hearing date. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

(f)  Class Proceedings and Consolidations.  Neither party shall be entitled to join or consolidate disputes by or against others in any arbitration, or to include in any arbitration any dispute as a representative or member of a class or to act in any arbitration in the interest of the general public or in a private attorney general capacity.

(g)  Payment of Arbitration Costs and Fees.  The arbitrator shall award all costs and expenses of the arbitration proceeding.

(h)  Miscellaneous.  To the maximum extent practicable, the AAA, the arbitrators and the parties shall take all action required to conclude any arbitration proceeding within 180 days of the filing of the dispute with the AAA. No arbitrator or other party to an arbitration proceeding may disclose the existence, content or results thereof, except for disclosures of information by a party required in the ordinary course of its business or by applicable law or regulation. If more than one agreement for arbitration by or between the parties potentially applies to a dispute, the arbitration provision most directly related to the documents between the parties or the subject matter of the dispute shall control. This arbitration provision shall survive termination, amendment or expiration of any of the documents or any relationship between the parties.

(i)  Small Claims Suits.  Notwithstanding anything herein to the contrary, each party retains the right to pursue in Small Claims Court any dispute in which the remedy sought is entirely within that court's jurisdiction.

**EARLY TERMINATION.** Notwithstanding anything in this Lease to the contrary, provided no Event of Default has occurred and is continuing, Lessee may terminate this Lease at any time during the initial term by giving at least 30 days prior written notice to Lessor (which notice shall be irrevocable), designating a scheduled rent payment date as the date upon which this Lease shall terminate (the "Designated Early Termination Date"). On or before the Designated Early Termination Date, Lessee shall pay to Lessor all of the following: (i) the amount set forth in the Termination Value Schedule attached hereto opposite the Designated Early Termination Date (the "Termination Value"), (ii) all rent and other amounts due and to become due under the Lease through and including the Designated Early Termination Date, including late fees. Lessee's indemnity obligations shall remain in effect notwithstanding such termination.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90017.

A true and correct copy of the foregoing document entitled **DECLARATION OF KHALID LEMLIH IN SUPPORT OF DEBTOR'S MOTION FOR AN ORDER: (1) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES; (2) APPROVING OF THE DEBTOR'S ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND DETERMINING CURE AMOUNTS AND APPROVING OF THE DEBTOR'S REJECTION OF THOSE UNEXPIRED LEASES AND EXECUTORY CONTRACTS WHICH ARE NOT ASSUMED AND ASSIGNED; (3) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d); AND (4) GRANTING RELATED RELIEF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **_October 30, 2019_**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Jessica L Bagdanov    jbagdanov@bg.law, ecf@bg.law**
- **Ron Bender    rb@lnbyb.com**
- **Beth Gaschen    bgaschen@wgllp.com,
  kadele@wgllp.com;vrosales@wgllp.com;cbmeeker@gmail.com;cyoshonis@wgllp.com**
- **Richard H Golubow    rgolubow@wcghlaw.com,
  pj@wcghlaw.com;jmartinez@wcghlaw.com;Meir@virtualparalegalservices.com**
- **David M Goodrich    dgoodrich@wgllp.com, vrosales@wgllp.com;kadele@wgllp.com**
- **Deb Harris    deb_harris@karney.net, deb.har3@outlook.com**
- **D Edward Hays    ehays@marshackhays.com, 8649808420@filings.docketbird.com**
- **Jeffrey A Krieger    jkrieger@ggfirm.com,
  kwoodson@greenbergglusker.com;calendar@greenbergglusker.com;jking@greenbergglusker.com**
- **Kenneth G Lau    kenneth.g.lau@usdoj.gov**
- **Matthew A Lesnick    matt@lesnickprince.com, matt@ecf.inforuptcy.com;jmack@lesnickprince.com**
- **Tinho Mang    tmang@marshackhays.com, 8444806420@filings.docketbird.com**
- **Catherine Schlomann Robertson    crobertson@pahl-mccay.com, mle@pahl-mccay.com**
- **Ariella T Simonds    asimonds@ktbslaw.com**
- **Lindsey L Smith    lls@lnbyb.com, lls@ecf.inforuptcy.com**
- **Marcus Tompkins    mtompkins@ygalaw.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
- **Reed S Waddell    rwaddell@frandzel.com, sking@frandzel.com**
- **Alan J Watson    alan.watson@hklaw.com, rosanna.perez@hklaw.com**

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On **_October 30, 2019_**, I will serve the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_June 2012_                                                                    **F 9013-3.1.PROOF.SERVICE**

**3.   SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on ***October 30, 2019,*** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**SERVED BY PERSONAL DELIVERY**
The Hon. Sheri Bluebond
United States Bankruptcy Court
255 E. Temple Street, Suite 1534 / Courtroom 1539
Los Angeles, CA 90012

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 30, 2019 | Lourdes Cruz | /s/ Lourdes Cruz |
| --- | --- | --- |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**